IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| MURRAY INSURANCE ASSOCIATES, INC.<br>39 North Duke Street<br>Lancaster, PA 17608-1728 | : : : : : | |
| Plaintiff, | : : | Civil Action No. _____ |
| v. | : : | |
| NEBIYOU AYNU<br>1800 Jonathan Way<br>Apt. 802<br>Reston, VA 20190-3682 | : : : : : : | |
| And | : : | |
| KINGDOM BONDING, INC.<br>11166 Fairfax Blvd., #1070<br>Suite 500<br>Fairfax, VA 22030-5071 | : : : : : : | |
| Defendants. | : | |

**COMPLAINT**

Plaintiff Murray Insurance Associates, Inc. ("Murray Insurance" or "Plaintiff"), by and through its undersigned counsel, files this Complaint against its former employee Nebiyou Aynu ("Aynu") and his company Kingdom Bonding, Inc. ("Kingdom Bonding") (Aynu and Kingdom Bonding are referred to collectively as "Defendants") seeking damages against Defendants to address Aynu's breach of his Restrictive Covenants Agreement he entered into in connection with his employment with Murray Insurance. In support of the foregoing, Plaintiff avers as follows:

1

## PARTIES, JURISDICTION, AND VENUE

1. Murray Insurance is a Pennsylvania corporation with a principal place of business located at 39 North Duke Street, Lancaster, Pennsylvania 17608-1728.

2. Aynu is an adult individual who resides at 1800 Jonathan Way, Apt. 802, Reston, Virginia 20190-3682.

3. Kingdom Bonding is a Virginia corporation with a principal place of business located at 11166 Fairfax Blvd., #1070, Suite 500, Fairfax, Virginia 22030-5017.

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as diversity of citizenship exists and the amount in controversy exceeds $75,000.

5. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b), because Defendants reside in this district and a substantial part of the events or omissions giving rise to this civil action occurred in this district.

## FACTS

6. Murray Insurance is in the highly competitive business of providing commercial and private insurance brokerage, risk management, and financial advisory services throughout the mid-Atlantic and eastern states regions of the United States.

7. Aynu became employed by Murray Insurance as a Surety Bond Producer in or around October of 2017.

8. In this role, Aynu provided contract surety bonds to contractors, subcontractors, and other construction project participants, as well as commercial surety bonds to individuals and businesses.

9. To succeed as a Surety Bond Producer, Aynu was given access to Murray Insurance's valuable confidential information and client relationships.

10. As such, in connection with his employment with Murray Insurance, Aynu entered into a Restrictive Covenants Agreement (hereinafter, the "Agreement"), effective February 18, 2022. A true and correct copy of the Agreement is attached hereto as **Exhibit A**.

### *Relevant Terms of the Agreement*

11. Aynu signed the Agreement for good and valuable consideration, including but not limited to, the training provided by Murray Insurance to Aynu, access to Murray Insurance's confidential information and trade secrets, compensation and benefits paid to Aynu while employed by Murray Insurance, as well as the continuation of Aynu's employment with Murray Insurance. *Id.* at Preamble.

12. By entering into the Agreement, Aynu agreed explicitly to protect Murray Insurance's confidential information and trade secrets. *Id*. at ¶ 2.

13. Under the Agreement, Aynu acknowledged and agreed that for a period of two (2) years after the end of his employment with Murray Insurance, he would not directly or indirectly, through any person or entity:

> (i) initiate contact with or solicit any Restricted Client or Active Prospective Client for the purpose of offering, selling, quoting, placing, providing or renewing any Insurance Products or Related Services; or
>
> (ii) take any action intended, or reasonably likely, to cause any Restricted Client or Active Prospective Client, to diminish its business with, or cease or refrain from doing business with, any member of Employer Group; or
>
> (iii) take any action intended, or reasonably likely, to cause any vendor, retail insurance agent or broker, or other trade-related business relation of any member of Employer Group with whom [Aynu] had a material working relationship during the final six months of [his] employment with [Murray Insurance] to diminish its business with, or cease or refrain from doing business with, any member of Employer Group….

*Id.* at ¶ 3(a)(i)-(iii).

14. The "Employer Group" refers to Murray Insurance and its affiliates, subsidiaries, and parent companies and each of their respective successors and assigns. *Id.* at ¶ 2(a).

15. Additionally, a "Restricted Client" is narrowly defined to include any client of the Employer Group during the two (2) years immediately preceding the date upon which Aynu's employment with Murray Insurance ends for any reason:

> (i) as to which [Aynu] received any commission, bonus, fee or any other compensation; or
>
> (ii) for which [Aynu] had material involvement in proposing, selling, quoting, placing, providing, referring, servicing, or renewing any Insurance Products or Related Services; or
>
> (iii) about whom [Aynu] received Confidential Information and/or confidential financial information belonging to such client.

*Id.* ¶ 3(c).

16. Further, a "Active Prospective Client" is narrowly defined to mean any prospective client of the Employer Group during the two (2) years immediately preceding the date upon which Aynu's employment with Murray Insurance ends for any reason:

> (i) as to which [Aynu] solicited for Insurance Products or Related Services; or
>
> (ii) for which [Aynu] made material efforts in proposing, selling, quoting, placing, providing, referring, servicing, or renewing any Insurance Products or Related Services; or
>
> (iii) about whom [Aynu] received Confidential Information and/or confidential financial information belonging to such client.

*Id.* ¶ 3(d).

17.     Moreover, "Insurance Products and Related Services" includes, but is not limited to, bonds or suretyship products and services relating to marketing, selling, or servicing same. *Id.* at ¶ 3(e)(i)-(ii).

18.     Notably, Aynu acknowledged and agreed that any breach of the Agreement could give a competitor a substantial unfair advantage and cause irreparable harm to Murray Insurance. *Id.* at ¶ 6.

19.     Aynu's execution of the Agreement was knowing and informed.

### *Aynu's Nefarious Conduct*

20.     Aynu's employment with Murray Insurance ended on or about April 6, 2023.

21.     Subsequently, Aynu became self-employed and formed Kingdom Bonding on or around May 12, 2023.

22.     Kingdom Bonding directly competes with Murray Insurance.

23.     Indeed, Kingdom Bonding "was formed with a mission to educate and empower the construction community in the bonding process, enabling them to thrive as multi-million dollar firms." https://www.kingdombonding.com/our-story.

24.     According to its website:

> Neb Aynu, the founder and owner of Kingdom Bonding, discovered the surety industry **while pursuing an opportunity to become a surety producer at a local insurance firm in Northern Virginia**. During his tenure, he built and managed a book of business up to $1 million, becoming the top producer of new business among 200 producers in his agency and ranking in the top 3% among over 2,000 producers nationwide.

https://www.kingdombonding.com/our-story (emphasis added).

25. Aynu's LinkedIn profile attributes Murray Insurance/AssuredPartners as the local insurance firm where he built and managed a million-dollar book of business. https://www.linkedin.com/in/neb-aynu-02368893.

26. AssuredPartners acquired Murray Insurance in January 2021.

27. Despite Aynu's post-employment legal obligations, Murray Insurance has uncovered that Aynu is actively soliciting Restricted Clients—clients that he proudly showcases on Kingdom Bonding's website and his LinkedIn profile. Additionally, he is targeting Murray Insurance's Active Prospective Clients, all of whom he serviced or solicited in the last two years of his tenure with the company.

28. For example, shortly after Aynu's departure from Murray Insurance, on or about April 20, 2023, Murray Insurance learned that Aynu contacted one of its largest markets, Liberty Surety, by way of text messaging Liberty Surety's bond manager that "big things were coming."

29. Further, in or around May of 2023, Murray Insurance discovered that Aynu was improperly soliciting the business of Fort Myer Construction Company ("FMCC")—a Restricted Client under the Agreement—with which Aynu would have no relationship but for his employment with Murray Insurance.

30. Aynu was well-aware that Murray Insurance had an exclusive ten-plus year relationship with FMCC—which Aynu intentionally and wrongfully severed.

31. In fact, FMCC informed Murray Insurance that FMCC would no longer need Murray Insurance for an event that was set to take place in June of 2023 because FMCC decided to use Aynu and Kingdom Bonding over Murray Insurance.

32. To make matters worse, while Murray Insurance was on the telephone with an FMCC agent, it was placed on hold and told that Aynu was calling on the other line.

33. Aynu's improper actions have and continue to cause Murray Insurance damage that is incalculable based on the referrals that it would typically receive from an event such as the FMCC event.

34. Additionally, on or around October 24, 2023, Aynu gave a presentation to the DC Department of Small and Local Business Development ("DCSLBD")—an organization with which Aynu would have no relationship but for his employment with Murray Insurance.

35. It is believed that Aynu reached out to the DCSLBD to take this presentation opportunity away from Murray Insurance.

36. Indeed, the DCSLBD is an invaluable referral source to Murray Insurance, and Murray Insurance routinely participates in events held by the DCSLBD.

37. In fact, in March of 2023, while still employed with Murray Insurance, Aynu received a referral from the DCSLBD on Murray Insurance's behalf.

38. Thus, Aynu is prohibited from soliciting business from the DCSLBD per the express terms of the Agreement.

39. Murray Insurance was also made aware that Aynu is attending events held by the DC Hispanic Contractors Association ("DCHCA")—another valued referral source of Murray Insurance for which Aynu would have no relationship but for his employment with Murray Insurance.

40. Moreover, Aynu is hosting bonding workshops and bond education programs for the DCHCA.

41. It is believed that Aynu reached out to the DCHCA to take these hosting opportunities away from Murray Insurance.

42. Bonding workshops and bonding education programs are core business-development opportunities for Murray Insurance.

43. In or around November of 2023, Murray Insurance also learned that Aynu improperly solicited and successfully took the business of Unicom Consultants, LLC—an Active Prospective Client under the Agreement—with which Aynu would have no relationship but for his employment with Murray Insurance.

44. Around that same time, Murray Insurance was advised that Aynu improperly solicited the business of Triune Solutions—a Restrict Client under the Agreement. While his efforts were unsuccessful, Aynu's actions are in direct violation of his obligations under the Agreement.

45. Undoubtedly, Aynu knew he was prohibited from soliciting Triune Solutions' business, as he worked on this account and signed its bonds during the last two years of his employment with Murray Insurance.

46. In March of 2024, Murray Insurance also learned that Aynu solicited business and issued a $1,000,000 bid bond for Snow's General Merchandise, Inc. ("Snow")—a Restricted Client under the Agreement.

47. Snow is a client of Construction Bonds, Inc. ("CBI"), a Murray Insurance subsidiary.

48. CBI has been writing bonds for Snow since 2020. Aynu knows the Agreement prohibits him from soliciting CBI's business.

49. Should Snow win the contract relating to the $1,000,000 bond, the amount realized for Aynu is $30,000 (premium) and $12,000 (revenue)—all to Aynu's benefit and Murray Insurance's detriment.

50. On or about May 9, 2024, CBI was informed that Aynu improperly solicited the business of One Source Construction ("One Source")—yet another Restricted Client under the Agreement—by way of marketing OneSource to a surety.

51. One Source generated over $20,000 in revenue for CBI in 2023. Fortunately, Aynu's efforts were not successful, and CBI was able to recover One Source's business.

52. Nevertheless, Aynu's attempt to pilfer Restricted Clients is a direct violation of his obligations under the Agreement, regardless of whether those efforts are successful or not.

53. Moreover, Aynu solicited yet another Restricted Client of Murray Insurance, SPD Contracting. And his efforts were successful.

54. Murray Insurance wrote bonds for SPD Contracting during Aynu's last two years of employment. But due to Aynu's improper conduct, Murray Insurance lost the account and Aynu and Kingdom Bonding now service SPD Contracting.

55. SPD Contracting generated over $85,000 in revenue for Murray Insurance in 2023.

56. Further, Murray Insurance discovered that Aynu has been corresponding with Restricted Clients and Active Prospective Clients via LinkedIn.

57. For example, Murray Insurance received a notification that Aynu was communicating via LinkedIn messaging with Khan Builders—a Restricted Client under the Agreement.

58. Therefore, it is undeniable that Aynu is actively poaching Murray Insurance's Restricted Clients and Active Prospective Clients, and the aforesaid instances are not exhaustive.

59. Indeed, in the surety industry, a surety producer can simply take an account and move it to another carrier without any notification given to the existing broker or carrier, and bond revenue is not included on profit and loss statements.

60. Thus, there could be numerous other occasions that Aynu improperly took business from Restricted Clients which Murray Insurance has yet to discover.

61. Indeed, aside from the above-mentioned Restricted Clients that Murray Insurance has lost due to Aynu's improper solicitation, Murray Insurance has identified an additional sixteen (16) Restricted Clients that Murray Insurance has lost since Aynu's departure.

62. It is believed Murray Insurance lost these additional sixteen (16) clients due to Aynu's improper solicitation and blatant disregard of his post-employment obligations under the Agreement.

63. Despite Murray Insurance's multiple efforts to resolve this matter short of litigation, Aynu continues to actively solicit Murray Insurance's clients and prospective clients—in direct violation of the Agreement.

### *Aynu Disregarded Murray Insurance's Cease and Desist Letters*

64. On April 14, 2023, Murray Insurance sent Aynu a letter reminding him of his post-employment obligations and enclosed a copy of the Agreement. A true and correct copy of the April 14, 2023 letter is attached hereto as **Exhibit B**.

65. Aynu responded on April 19, 2023 by falsely asserting he did not improperly solicit business, which Murray Insurance now knows to be untrue. A true and correct copy of the Aynu's April 19, 2023 response is attached hereto as **Exhibit C**.

66. On May 26, 2023, Murray Insurance sent Aynu a cease-and-desist letter, again reminding him of his post-employment restrictive covenants and requesting a response, in writing, by June 2, 2023. A true and correct copy of the May 26, 2023 cease-and-desist letter is attached hereto as **Exhibit D**.

67. Aynu failed to provide any response to the May 26, 2023 cease-and-desist letter.

68. On November 3, 2023, Murray Insurance sent Aynu a final warning and demanded that he cease and desist from soliciting its business. A true and correct copy of the November 23, 2023 final warning letter is attached hereto as **Exhibit E**.

69. On November 15, 2023, Aynu responded claiming:

> [N]o deliberate actions were taken, either explicitly or by reasonable inference, to induce any vendor, retail insurance agent or broker, or other business entity associated with any member of the Employer Group, with whom the employee maintained a substantive working relationship in the final six months of their tenure with the Company, to curtail its business with, or terminate or abstain from conducting business with, any member of the Employer Group.

A true and correct copy of Aynu's November 15, 2023 response letter is attached hereto as **Exhibit F** (emphasis added).

70. In other words, Aynu claims he is complying with ¶ 2(a)(iii) of the Agreement but fails to even acknowledge the provisions of the Agreement concerning his non-solicitation and non-interference obligations. *See* **Exhibit A** at ¶ 2(a)(i)-(iv) and **Exhibit F**.

71. Aynu's response is nothing more than an attempt to justify his wrongful actions while he continues to circumvent his post-employment obligations—all to Murray Insurance's detriment and Defendants' advantage.

### CLAIMS FOR RELIEF

### COUNT I
### Breach of Contract – Breach of the Agreement
### (Against Aynu)

72. Murray Insurance hereby realleges and incorporates by reference the preceding allegations as if fully set forth at length herein.

73. The Agreement is a valid, binding, and enforceable contract supported by adequate consideration.

74. Aynu breached the Agreement by improperly soliciting and gaining clients and prospective clients from Murray Insurance to Kingdom Bonding.

75. As a result of Aynu's conduct, Murray Insurance has suffered and will continue to suffer actual damages and loss, including loss of valuable and substantial business and customer relationships; loss of the benefit of its contractual bargains; loss of profits and future profits; and other damages, all of which are ongoing.

**WHEREFORE**, Plaintiff Murray Insurance demands judgment against Defendant Aynu for damages, together with an award of attorney's fees and costs, and other relief this Court deems just and proper.

## COUNT II
### Tortious Interference with Contract
**(Against Defendants)**

76. Murray Insurance hereby realleges and incorporates by reference the preceding allegations as if fully set forth at length herein.

77. Murray Insurance has developed and maintained substantial, contractual, and profitable business relationships with its clients, including those clients whom Defendants improperly solicited and transferred from Murray Insurance to Kingdom Bonding.

78. Defendants knew or should have known about these contracts and profitable business relationships.

79. Defendants intentionally, maliciously, and improperly interfered with, and continue to interfere with Murray Insurance's contractual client relationships by soliciting Murray Insurance's clients to move their business from Murray Insurance to Kingdom Bonding and, in fact, successfully moving certain clients from Murray Insurance to Kingdom Bonding.

80. As a direct result of Defendants' conduct, Murray Insurance has suffered and will continue to suffer actual damages and loss, including loss of valuable and substantial business and customer relationships; loss of the benefit of its contractual bargains; loss of profits and future profits; and other damages, all of which are ongoing.

81. Murray Insurance is entitled to punitive damages.

**WHEREFORE**, Plaintiff Murray Insurance demands judgment against Defendants for damages, together with an award of attorney's fees and costs, and other relief this Court deems just and proper.

## COUNT III
### Tortious Interference with Business Expectancy
**(Against Defendants)**

82. Murray Insurance hereby realleges and incorporates by reference the preceding allegations as if fully set forth at length herein.

83. Murray Insurance has made substantial and material efforts in proposing, selling, quoting, servicing and/or renewing prospective clients with the expectation that those prospective clients would become clients thereby generating profits for Murray Insurance.

84. Defendants knew or should have known about Murray Insurance's efforts towards its prospective clients and its expectations that would derive therefrom.

85. Defendants intentionally, maliciously, and improperly interfered with, and continue to interfere with Murray Insurance's prospective client relationships by soliciting Murray Insurance's prospective clients and, in fact, successfully attaining certain prospective clients to bring their business to Kingdom Bonding over Murray Insurance.

86. As a direct result of Defendants' conduct, Murray Insurance has suffered and will continue to suffer actual damages and loss, including loss of prospective clients and business

expectations; loss of valuable and substantial business and customer relationships; loss of profits and future profits; and other damages, all of which are ongoing.

**WHEREFORE**, Plaintiff Murray Insurance demands judgment against Defendants for damages, together with an award of attorney's fees and costs, and other relief this Court deems just and proper.

## COUNT IV
### Unjust Enrichment
### (Against Defendants)

87. Murray Insurance hereby realleges and incorporates by reference the preceding allegations as if fully set forth at length herein.

88. As a result of the conduct alleged herein, Defendants have been unjustly enriched by successfully soliciting and acquiring clients from Murray Insurance to Kingdom Bonding in violation of the Agreement.

89. Defendants have appreciated, accepted, and retained these benefits under circumstances that would make it unjust and inequitable for Defendant to retain them without payment of value to Murray Insurance.

90. Allowing Defendants to benefit from such conduct would be unfair and should be prohibited.

91. As a direct result of Defendants conduct, Murray Insurance has suffered and will continue to suffer actual damages and loss, including loss of valuable and substantial business and customer relationships; loss of the benefit of its contractual bargains; loss of profits and future profits; and other damages, all of which are ongoing.

**WHEREFORE**, Plaintiff Murray Insurance demands judgment against Defendants for damages, together with an award of attorney's fees and costs, and other relief this Court deems just and proper.

## **PRAYER FOR RELIEF**

For the reasons set forth above, Murray Insurance respectfully requests that the Court enter judgment:

(A)   For Plaintiff and against Defendants on each Count of the foregoing Complaint;

(B)   For compensatory damages (exceeding $75,000) and punitive damages, plus interest, in an amount to be proved at trial;

(C)   For attorney's fees and costs; and

(B)   For such other and further relief as this Court deems equitable and just.


[Remainder of page intentionally left blank. Signature page follows.]

        Respectfully submitted,

        **FISHER & PHILLIPS LLP**

        /s/ *David J. Walton*
        David J. Walton, Esquire
        (Virginia Attorney ID No. 38597)
        Heather C. McFeeley, Esquire
        (*pro hac vice forthcoming*)
        Two Logan Square, 12th Floor
        100 N. 18th Street
        Philadelphia, PA 19103
        Tel.   (610) 230-6105/2138
        Fax   (610) 230-2151
        Email  dwalton@fisherphillips.com
                  hmcfeeley@fisherphillips.com

Dated:  June 14, 2024        *Attorneys for Plaintiff*